Meyer BILLER, Petitioner,

v.

Raymond LOPES, Respondent.

Civ. No. N–86–229(AHN).

United States District Court,
D. Connecticut.

March 5, 1987.

Howard A. Jacobs & William M. Bloss, Jacobs, Grudberg, Belt & Dow, P.C., New Haven, Conn., M. Mitchell Morse, University of Bridgeport School of Law, Bridgeport, Conn., for petitioner.

Steven M. Sellers, Office of the Chief State's Atty., Wallingford, Conn., for respondent.

## MEMORANDUM OF DECISION ON PETITION FOR WRIT OF HABEAS CORPUS

NEVAS, District Judge.

Meyer Biller, a former licensed public adjuster, has been convicted in the Connecticut Superior Court of interfering with a police officer. The Court has released him on bond pending this decision. He seeks a petition for a writ of habeas corpus pursuant to 28 U.S.C. Sec. 2241. He claims that his conviction for interfering with a police officer violated the Fifth and Fourteenth Amendments in that it is the fruit of a coerced confession. For the reasons set forth below, the petition is GRANTED.

### I. Facts

#### A.

The petitioner is presently challenging the legality of his 1982 conviction on charges of interfering with a police officer in violation of Conn.Gen.Stat.Sec. 53a–167a. However, this challenge is based upon the illegal use of his 1976 conviction on a two count information charging him with falsely certifying two oaths in violation of Conn. Gen.Stat.Sec. 53–368. Accordingly, the Court begins by examining the facts surrounding the 1976 conviction.

On April 13, 1975, and April 18, 1975, suspicious fires heavily damaged an apartment building located at 66–68 Norton Street in the city of New Haven. The property was an asset of the Bridgehaven Corporation, a closely held corporation controlled by Peter and Marilyn Cappola.

Peter Cappola, a key state's witness, had insured the property for approximately $580,000. Prior to the date of the

fires, the Cappolas had retained [Meyer Biller] for the purpose of settling claims with insurance companies. Also prior to the date of the April 13, 1975 fire, Peter Cappola advised Biller that a fire would in fact occur. Cappola admitted setting the April 13, 1975 fire, but denied any involvement in the April 18, 1975 fire.

Biller proceeded to adjust claims arising out of both fires. He and his son, Lawrence Biller, prepared a detailed survey itemizing the damage and replacement costs. Before the expiration of the deadline for filing proofs of loss with the insurance company, Biller provided Peter Cappola with two proof of loss forms and instructed Cappola to take them home and get his wife's signature. Cappola took the forms home. There the Cappolas signed one blank form for each fire. These signed but otherwise blank forms were then submitted to [Biller's] office. The Cappolas were unaware of the amounts claimed in the proofs of loss until after their submission to the insurer. Neither Peter nor Marilyn Cappola took an oath concerning the claims submitted.

Gerald Hale, the insurance company adjuster, received the proofs with a cover letter from the defendant and sent them on to the insurer. When Hale received the proof of loss statements, they were completely filled with no blank lines remaining on the forms. The forms were signed by the defendant as a notary. The damages claimed were $538,180.58 for the April 13 fire and $123,206.60 for the April 18 fire. Hale, who had examined the Norton Street structure soon after both fires and on subsequent occasions, considered the claims excessive. It was Hale's opinion that $225,000.00 and $75,000.00 were proper figures for the first and second fires respectively. Additionally there was evidence that the defendant had inflated the figures by twenty percent and that he had charged a fee of ten percent of the settlement.

*State v. Biller,* 190 Conn. 594, 596–97, 462 A.2d 987 (1983) (hereinafter referred to as "Biller I").

On appeal, Biller claimed that the trial court erred in admitting statements allegedly compelled from him by a one man investigative grand jury. Meyer Biller and his son, Lawrence, were engaged in the adjuster business under the name "Biller Associates." Biller appeared before the grand jury on nine different days between October 9, 1975 and March 12, 1976. The Connecticut Supreme Court found that, when questioned about his activities on behalf of Biller Associates, Meyer Biller consistently asserted his constitutional privilege against self-incrimination. Nevertheless, "[t]he grand juror ordered him to answer the questions because they involved actions which the defendant might have taken in a corporate capacity regardless of whether the answers would implicate [him] personally." *Id.* at 599, 462 A.2d 987.

At the *Biller I* trial, the State offered several statements which the petitioner made before the investigative grand jury. The statements were offered in the form of excerpts from the grand jury transcript. In this testimony, Biller implied that he sometimes would obtain blank proof of loss forms and would have an insured sign them before completing the claim information. *Id.* at 598–99 n. 1, 462 A.2d 987. The Connecticut Supreme Court found that the grand juror had violated the petitioner's Fifth Amendment rights by compelling him to make incriminating statements in his "corporate capacity." *Id.* at 601, 462 A.2d 987. Since two excerpts of this coerced testimony were admitted at trial, the supreme court set the conviction aside and ordered a new trial.

On remand, Superior Court Judge J. Higgins found that the petitioner could not, as a matter of law, have committed the crimes with which he was charged, even assuming the State's version of the facts. *State v. Biller,* No. 22265, Memorandum of Decision on Motion to Dismiss (Superior Court, Judicial District of New Haven, August 15, 1984). Construing applicable statutes, Judge Higgins concluded that a proof of loss of the type that Meyer Biller was accused of improperly filing "is not required to be sworn to under oath." *Id.* at 6. Accordingly, he could not be charged

with falsely certifying to the admininsta-tion of an oath in violation of Conn.Gen.Stat.Sec. 53–368. The State never appealed the dismissal of the charges.

## B.

The circumstances surrounding the con-viction which the petitioner now challenges are as follows:

On March 12, 1981, a fire took place at a house owned by Wilken Shaw located at 79 Hallock Street in New Haven. At the scene of the fire, Joseph Toscano, an arson control assistant inspector as-signed to the office of the New Haven State's Attorney, saw the defendant ap-proach Shaw and his daughter-in-law, Willa Shaw. Toscano watched as the defendant spoke to the Shaws and pro-vided them with some documents which Wilken Shaw signed. Toscano then ap-proached the defendant and the Shaws with another officer, Joseph Howard. As the officers approached the trio, they heard the defendant state to the Shaws that he would contact the insurance com-panies.

Toscano identified himself to the de-fendant who responded by acknowl-edging that he knew Toscano's identity. Toscano then asked the defendant if he was licensed to act as a public adjuster in this state. Toscano also, at that time, saw the documents which Shaw had signed. He believed that one of those documents was a retainer for the servic-es of a public adjuster. Because he knew that the defendant no longer was licensed as a public adjuster, Toscano ordered the defendant's arrest for violat-ing General Statutes Sec. 38–71, which prohibits acting as a public adjuster with-out a license.

At some time during these events, the defendant tore up certain documents which Shaw had signed and placed the pieces in his pocket. After the arrest, Howard handcuffed the defendant. When the officers attempted to search his pockets, however, the defendant re-sisted this effort and struggled to pre-vent them from doing so. The officers then led the defendant to a police car.

There, the police succeeded in entering the defendant's pockets and retrieving the remnants of the torn documents. *State v. Biller*, 5 Conn.App. 616, 618–19, 501 A.2d 1218 (1985) (hereinafter referred to as "Biller II").

The defendant was charged with acting as a public adjuster without a license in violation of Conn.Gen.Stat.Sec. 38–71 and interfering with a police officer in violation of Conn.Gen.Stat.Sec. 53a–167a. During the *Biller II* trial, the petitioner's appeal of his convictions in *Biller I* was still pending. Accordingly, the petitioner filed a motion in limine to prevent the State from impeach-ing him with that two count felony convic-tion. The record makes clear that Biller's decision on whether to testify was contin-gent on the trial court's granting of his motion in limine. However, the record is silent concerning whether Biller made any proffer of his proposed testimony. Ulti-mately, the *Biller II* trial court denied the motion in limine. As a result of this denial, Mr. Biller decided not to take the stand on his own behalf and risk impeachment by use of the felony convictions. *See Biller II* Transcript at 12.

The defendant pleaded not guilty to the charges against him. After the trial, the jury was unable to agree on a verdict on the first count, and a mistrial was declared as to that count. The jury, however, found the petitioner guilty on the second count, interfering with a police officer. On No-vember 24, 1982, the trial court sentenced the petitioner to the maximum sentence of one year imprisonment and imposed a $500.00 fine. In sentencing the petitioner, the trial judge apparently considered Mr. Biller's background, including his two, then valid, *Biller I* felony convictions. *Biller II* Transcript at 755 et seq. The Connecticut Appellate Court affirmed the *Biller II* con-viction. 5 Conn.App. at 625, 501 A.2d 1218. On March 6, 1986, the Connecticut Su-preme Court denied certification to appeal. Subsequently, the United States Supreme Court denied a petition for a writ of certio-rari.

## II. Questions Presented

The petitioner claims that his conviction in *Biller II* is unconstitutional because the trial court ruled that his prior convictions in *Biller I* were admissible for impeachment purposes. In effect, this ruling allowed the admission of a constitutionally invalid conviction, prevented the petitioner from testifying at the *Biller II* trial, and denied the petitioner a fundamentally fair trial. Accordingly, the petition seeks a writ of habeas corpus discharging him from custody unless the State grants him a new trial.

In the alternative, the petitioner claims that, during sentencing, the trial judge considered his prior felony conviction in *Biller I*, thus relying on misinformation of a constitutional magnitude and impermissibly enhancing his sentence. At the very least, the petitioner claims that his sentence should be vacated, and he should be re-sentenced. Because the Court finds that the petitioner's conviction in *Biller II* is unconstitutional, it need not address the petitioner's claim that he is entitled to a new sentencing hearing.

## III. Discussion

### A. Validity of the *Biller I* conviction

The petitioner's claim is based on the argument that his conviction in *Biller II* is unconstitutional because it was obtained, in part, through the derivative use of the compelled, involuntary grand jury testimony which resulted in the reversal of his prior felony convictions in *Biller I*. *See* Petition at para. 13. Before this Court can determine the validity of the *Biller II* conviction, it must be satisfied that: (1) The *Biller I* conviction was in fact obtained in violation of the Fifth Amendment prohibition against the use of coerced, self-incriminating statements; and, (2) The unconstitutional convictions in *Biller I* were sufficiently incorporated into the *Biller II* proceedings so as to taint the second conviction. *See United States v. Lauga,* 726 F.2d 1032, 1034–35 (5th Cir.1984); *cf. United States v. Penta,* 475 F.2d 92, 96 (1st Cir.), *cert. denied,* 414 U.S. 870, 94 S.Ct. 89, 38 L.Ed.2d 88 (1973) (Aldrich, J., concurring) (In analyzing the impact of the use of one constitutionally defective conviction in obtaining a subsequent conviction, the court must look to the "nature of the constitutional defect. . . .") The Court finds in favor of the petitioner on both these inquiries.

The Fifth Amendment protects an individual from being forced to provide government officials with self-incriminating testimony. It "not only protects the individual against being involuntarily called as a witness against himself in a criminal prosecution but also privileges him not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings." *Lefkowitz v. Turley,* 414 U.S. 70, 77, 94 S.Ct. 316, 322, 38 L.Ed.2d 274 (1973). Accordingly, *"any* criminal trial use against a defendant of his *involuntary* statement is a denial of due process of law 'even though there is ample evidence aside from the confession to support the conviction'." *Mincey v. Arizona,* 437 U.S. 385, 398, 98 S.Ct. 2408, 2416, 57 L.Ed.2d 290 (1978) (quoting *Jackson v. Denno,* 378 U.S. 368, 376, 84 S.Ct. 1774, 1780, 12 L.Ed.2d 908 (1964)) (emphasis in original).

Before the *Biller I* trial, the petitioner testified before Superior Court Judge Levine, then sitting as a one man grand jury investigating incidents of arson in the New Haven area. *Biller I,* 190 Conn. at 598–99, 462 A.2d 987. After examining the grand jury transcripts, the Connecticut Supreme Court concluded:

> [Meyer Biller] had been subpoenaed to the grand jury to produce his corporate records [from Biller Associates, a closely-held corporation]. Biller appeared before the grand jury on nine different days between October 9, 1975, and March 12, 1976. When questioned about his own activities on behalf of the corporation, Biller asserted his constitutional privilege against self-incrimination. The grand juror ordered him to answer the questions because they involved actions which the defendant might have taken in a corporate capacity regardless of whether the answers would implicate the de-

fendant personally. This ruling was established by Judge Levine on the defendant's first day of testimony before the grand jury and was reaffirmed on every subsequent day of testimony up to an including March 2, and March 4, when the defendant gave the statements that were later introduced at trial.

*Id.* at 599, 462 A.2d 987. The supreme court further found that Judge Levine erred by compelling the defendant to provide incriminating oral testimony in his "corporate capacity," and that Biller had asserted his Fifth Amendment privilege "on numerous occasions during the course of his testimony." Thus, the *Biller I* trial court erred by admitting into evidence, for the purpose of rebuttal, incriminating statements compelled from the petitioner at the investigative grand jury. Because his former convictions dealt with administering false oaths, and "credibility was crucial" at trial, the supreme court found that the admission of the testimony was not "harmless" error, thus necessitating reversal of the conviction.

 In a federal habeas proceeding, state court findings of fact are accorded a presumption of correctness. *Sumner v. Mata*, 455 U.S. 591, 102 S.Ct. 1303, 71 L.Ed.2d 480 (1982). Absent a finding that one of the factors listed in 28 U.S.C. Sec. 2254(d) is present, or that the state court's findings are not supported by the record, this presumption controls subsequent federal court habeas proceedings. *Id.* at 593, 102 S.Ct. at 1304. Having reviewed the state court grand jury transcripts, as well as relevant portions of the trial court transcripts, this Court agrees with the Connecticut Supreme Court's finding that the petitioner in fact asserted his Fifth Amendment privilege at the investigative grand jury and that his compelled testimony was later introduced for impeachment purposes at the *Biller I* trial.

However, the issue of the voluntariness of a confession is a mixed question of law and fact. *United States v. Charlton*, 565 F.2d 86, 88 (6th Cir.1977), *cert. denied*, 434 U.S. 1070, 98 S.Ct. 1253, 55 L.Ed.2d 773 (1978). "The test is whether, considering the totality of the circumstances, the free will of the witness was overborne." *United States v. Washington*, 431 U.S. 181, 188, 97 S.Ct. 1814, 1819, 52 L.Ed.2d 238 (1977). Because the ultimate question as to the constitutionality of introducing this testimony is a mixed question, the Court must make its own inquiry and be satisfied that the facts, as found by the state court and supported by the record, amount to a Fifth Amendment violation. *See Cuyler v. Sullivan*, 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980). Again, the Court agrees that the petitioner's Fifth Amendment rights were violated in the *Biller I* trial.

 In analyzing the right against compulsory self-incrimination, the United States Supreme Court has suggested that the Fifth Amendment right is substantially the same as immunity offered under 18 U.S.C. Sec. 6002. *See New Jersey v. Portash*, 440 U.S. 450, 99 S.Ct. 1292, 59 L.Ed.2d 501 (1979); *Kastigar v. United States*, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972); *see also United States v. Brown*, 699 F.2d 585, 590 (2d Cir.1983); *United States v. Tantalo*, 680 F.2d 903, 908 (2d Cir.1982). For example, an individual can assert his Fifth Amendment right in any proceeding, be it civil or criminal. *Kastigar*, 406 U.S. at 444, 92 S.Ct. at 1656. Once asserted, "it protects against any disclosure that the witness reasonably believes could be used in a criminal prosecution or could lead to other evidence that might be so used." *Id.* at 445, 92 S.Ct. at 1656. "[I]f a witness under compulsion to testify makes disclosures instead of claiming the privilege, the government has not 'compelled' him to incriminate himself," and the testimony can be used. *Garner v. United States*, 424 U.S. 648, 654, 96 S.Ct. 1178, 1182, 47 L.Ed.2d 370 (1976). However, once the privilege is claimed, if the defendant is nevertheless forced to testify, his testimony is compelled within the meaning of the Fifth Amenemdent. *Lefkowitz*, 414 U.S. at 78, 94 S.Ct. at 322. The State may compel an incriminating answer if neither the testimony nor its fruits are available for use against the witness in a later

criminal proceeding. *Id.* at 84, 94 S.Ct. at 325.

 Likewise, an individual's testimony before a grand jury, given under a grant of immunity, cannot be constitutionally used to impeach him if he is a defendant in a later criminal trial. *Portash,* 440 U.S. at 459–460, 99 S.Ct. at 1297–1298. "Testimony given in response to a grant of legislative immunity is the essence of coerced testimony." *Id.* at 459, 99 S.Ct. at 1297. Thus, statutory immunity leaves a witness in the same position as if he had claimed the Fifth Amendment privilege against compulsory self-incrimination. *Kastigar,* 406 U.S. at 462, 92 S.Ct. at 1665.

Here, the grand jury proceedings can almost be characterized as a sparring match between the State's Attorney and Mr. Biller. In this match, Biller attempted to shield himself with his Fifth Amendment privilege. Nevertheless, the State, with varying degrees of success, landed its punches by striking at the petitioner's "corporate capacity." The result is, while the State may have won the round, it jeopardized the match.

 Biller was called before the grand jury to produce corporate records. *Biller I,* 190 Conn. at 599, 462 A.2d 987. The privilege against self-incrimination does not extend to the records or documents of a corporation. *Grand Jury Subpoena Duces Tecum v. U.S.,* 657 F.2d 5, 6 (2d Cir. 1981) (citing *Bellis v. United States,* 417 U.S. 85, 87, 94 S.Ct. 2179, 2182, 40 L.Ed.2d 678 (1974)). "[A] corporate representative, acting in his or her representative capacity, cannot claim a fifth amendment privilege against the production of corporate documents.... The only exception to this rule may occur when an individual is *personally* compelled to produce and authenticate corporate records, and those acts are self-incriminatory." *In re Grand Jury Subpoenas Issued to Thirteen Corporations,* 775 F.2d 43, 46 (2d Cir.1985), *cert. denied,* — U.S. —, 106 S.Ct. 1459, 89 L.Ed.2d 716 (1986) (emphasis in original); *accord United States v. Beattie,* 541 F.2d 329, 331 (2d Cir.1976). In addition, a corporate custodian who produces corporate doc-

uments may be called upon to identify the documents he produces. Because that testimony is auxiliarly to the production, it is also unprivileged. *Apache Corp. v. McKeen,* 529 F.Supp. 459, 462 (W.D.N.Y. 1982).

 However, "once a corporate agent has fulfilled his duty to testify for the purpose of identifying material produced, he may exercise his personal privilege as to further questions relating to the records." *In re Grand Jury Subpoena Served upon Crown Video,* 630 F.Supp. 614, 618 (E.D. N.C. 1986). He cannot be compelled to give testimony which would furnish a link in the chain of evidence needed to prosecute him personally. *See United States v. Barth,* 745 F.2d 184, 187 (2d Cir.1984), *cert. denied,* 470 U.S. 1004, 105 S.Ct. 1356, 84 L.Ed.2d 378 (1985); *In re Grand Jury Subpoena Duces Tecum,* 657 F.2d at 8. In compelling testimony of a personal and incriminatory nature, then introducing that evidence at trial, the State overstepped constitutionally permissible boundaries.

The record demonstrates that the petitioner's testimony was not the product of a choice made free from coercion. He was forced to testify before the investigative grand jury. During his testimony, the petitioner consistently asserted his Fifth Amendment rights. *See, e.g.,* Grand Jury Transcripts, October 16, 1975 at 35; March 2, 1976 at 3, 11, 26, 115, 132, 198, 201, 207, 212; March 3, 1976 at 3, 59, 64; and, March 4, 1976 at 229. Over his objection, the grand juror compelled Biller to give testimony in which he suggested that it was a common procedure "to get blank proof of losses signed not indicating for what date or what area or what type of occurrence." *See* March 3, 1976 Transcript at 64–65; *Biller II,* 190 Conn. at 603–05 n. 5, 462 A.2d 987. Although Biller objected, this testimony was introduced at his trial to call into question his credibility. Where a coerced confession constitutes a part of the evidence before a jury, "[the Supreme] Court has uniformly held that even though there may be sufficient evidence, apart from the coerced confession, to support a judgment of conviction, the admission in

evidence, over objection, of the coerced confession vitiates the judgment because it violates the Due Process Clause of the Fourteenth Amendment." *Payne v. Arkansas*, 356 U.S. 560, 568, 78 S.Ct. 844, 850, 2 L.Ed.2d 975 (1958). Accordingly, the petitioner's conviction in *Biller I* was obtained, in part, in violation of his Fifth Amendment rights.

### B. Validity of *Biller II* conviction

The Connecticut Supreme Court, in overturning the *Biller I* conviction, found that, because credibility was crucial in that case, the introduction of the coerced testimony could not be considered harmless error. 190 Conn. at 606, 462 A.2d 987. The State urges the Court to apply a similar standard in reviewing the constitutionality of the *Biller II* conviction. While the Court agrees with the conclusion of the Connecticut Supreme Court, it respectfully disagrees with what appears to be an application of the harmless error standard. *See Biller I*, 190 Conn. at 606, 462 A.2d 987.

■ The threatened use of coerced testimony which results in a defendant's decision not to testify is not properly subject to harmless error analysis. Use of the harmless error standard reflects a judgment that the central purpose of a criminal trial is to decide the factual question of the defendant's guilt or innocence. *See United States v. Nobles*, 422 U.S. 225, 230, 95 S.Ct. 2160, 2166, 45 L.Ed.2d 141 (1975). It "promotes public respect for the criminal process by focusing on the underlying fairness of the trial rather than on the virtually inevitable presence of immaterial error." *Delaware v. VanArsdall*, — U.S. —, 106 S.Ct. 1431, 1436–37, 89 L.Ed.2d 674 (1986); *Brown v. U.S.*, 411 U.S. 223, 231–32, 93 S.Ct. 1565, 1570–71, 36 L.Ed.2d 208 (1973) (defendant entitled to fair trial, not perfect one.) Accordingly, the inquiry in cases in which the harmless error test applies is whether "there is a reasonable possibility that the improperly admitted evidence contributed to the conviction." *Schneble v. Florida*, 405 U.S. 427, 432, 92 S.Ct. 1056, 1060, 31 L.Ed.2d 340 (1972); *accord Johnstone v. Kelly*, 808 F.2d 214 (2d Cir.1986).

■ Although it has set forth the harmless error doctrine, the Supreme Court has recognized a group of "constitutional rights so basic to a fair trial that their infraction can never be treated as harmless error." *Chapman v. California*, 386 U.S. 18, 23, 87 S.Ct. 824, 827, 17 L.Ed.2d 705 (1967); *accord Holloway v. Arkansas*, 435 U.S. 475, 489, 98 S.Ct. 1173, 1181, 55 L.Ed.2d 426 (1978); *Klein v. Harris*, 667 F.2d 274, 289 (2d Cir.1981). These rights constitute basic protections, without which a criminal trial cannot reliably serve its function as a forum for the determination of guilt or innocence. *Rose v. Clark*, — U.S. —, 106 S.Ct. 3101, 3106, 92 L.Ed.2d 460 (1986). This group consists of errors that "either abort the basic trial process ... or deny it altogether." *Id.* at n. 6. The use of a coerced confession is one such error and thus requires automatic reversal. *United States v. Hasting*, 461 U.S. 499, 508 n. 6, 103 S.Ct. 1974, 1980 n. 6, 76 L.Ed.2d 96 (1983); *Portash*, 440 U.S. at 459, 99 S.Ct. at 1297; *Payne*, 356 U.S. at 567–68, 78 S.Ct. at 849–51; *Flittie v. Solem*, 775 F.2d 933, 944 n. 18 (8th Cir.1985), *cert. denied*, — U.S. —, 106 S.Ct. 1223, 89 L.Ed.2d 333 (1986).

The Supreme Court has unequivocally stated that, while a statement taken in violation of *Miranda* can be used for impeachment purposes, one taken in violation of the right against compulsory self-incrimination cannot be so used. *Portash*, 440 U.S. at 459, 99 S.Ct. at 1297; *cf. United States v. Savell*, 546 F.2d 43, 46 (5th Cir. 1977). Although both involve the Fifth Amendment, the inquiry into "voluntariness" is distinct in each case. "By prohibiting further interrogation after the invocation of [Miranda] rights, [the Supreme Court has] erect[ed] an auxiliary barrier against police coercion." *Connecticut v. Barrett*, — U.S. —, —, 107 S.Ct. 828, 832, 93 L.Ed.2d 920 (1987). Thus, in *Miranda* cases, the inquiry is whether an individual has "voluntarily, knowingly, and intelligently" waived his constitutional right to remain silent while in custody. *Colorado v. Spring*, — U.S. —, —, 107 S.Ct. 851, 857, 93 L.Ed.2d 954 (1987).

In coerced self-incrimination cases, the focus is whether a confession is the product of a choice which is essentially free from overbearing coercion by state actors. *Compare Colorado v. Connelly,* — U.S. —, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986) *with · Culombe v. Connecticut,* 367 U.S. 568, 602, 81 S.Ct. 1860, 1879, 6 L.Ed.2d 1037 (1961). It is difficult to conclude with assurance that any confession does not have a substantial impact on a jury. *United States v. Janoe,* 720 F.2d 1156, 1165 (10th Cir.1983), *cert. denied,* 465 U.S. 1036, 104 S.Ct. 1310, 79 L.Ed.2d 707 (1984). Moreover, the right against compulsory self-incrimination is so basic to a fair trial that its abrogation should not lightly be "brushed aside" as harmless. *See McGuinn v. Crist,* 492 F.Supp. 478, 482 (D.Mont.1980), *rev'd on other grounds,* 657 F.2d 1107 (9th Cir.1981), *cert. denied,* 455 U.S. 990, 102 S.Ct. 1614, 71 L.Ed.2d 850 (1982). Thus, "[t]ruly involuntary confessions—as opposed to those obtained unlawfully through violations of *Miranda* or *Escobedo*—appear to constitute one of the few areas of criminal law in which courts have steadfastly refused to apply the harmless error doctrine." *Vargas v. Brown,* 512 F.Supp. 271, 278 (D.R.I.1981). Accordingly, the introduction of the fruit of coerced testimony into the *Biller II* proceedings invariably requires a new trial. *See Lynumn v. Illinois,* 372 U.S. 528, 537, 83 S.Ct. 917, 922, 9 L.Ed.2d 922 (1963).

In *Biller II,* the petitioner was charged with acting as a public adjuster without a license and with interfering with a police officer. During trial, the petitioner filed a motion in limine to prevent the state from impeaching him with the *Biller I* convictions, then on appeal. The trial court denied the motion. As a direct consequence, the petitioner decided not to take the stand on his own behalf. The petitioner was convicted only of interfering with a police officer.

In considering this claim of error, the Connecticut Appellate Court treated the petitioner's claim as one merely alleging an evidentiary error. It summarily concluded: "The trial court, in its discretion, may admit evidence of a prior conviction for im-peachment purposes despite the pendency of an appeal." 5 Conn.App. at 623, 501 A.2d 1218. While this finding may be true as a matter of state law, it is not dispositive of the petitioner's claim that his federal constitutional rights were violated. As the petitioner points out, and the respondent concedes, the Appellate Court, while presented with this constitutional argument, failed to address it. *See* Response to Petition at 7–8. Therefore, the Court can properly decide this issue on the merits. *Smith v. Digmon,* 434 U.S. 332, 98 S.Ct. 597, 54 L.Ed.2d 582 (1978).

Case law suggests that the threatened derivative use of coerced testimony which results in a defendant not testifying at trial is not subject to harmless error analysis. For example, in *Loper v. Beto,* 405 U.S. 473, 92 S.Ct. 1014, 31 L.Ed.2d 374 (1972), the Supreme Court considered whether the use of a prior void conviction, for impeachment purposes, deprived a defendant of due process of law where its use might have influenced the outcome of the case. In *Loper,* the prior convictions were overturned because the petitioner's prior felony conviction had been obtained without the petitioner having been represented by counsel, a violation of *Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963). As with the use of a coerced confession, a denial of the right to counsel is not subject to harmless error analysis. *Chapman,* 386 U.S. at 23, n. 8, 87 S.Ct. at 828, n. 8. Accordingly, the *Loper* Court held that "the use of convictions constitutionally invalid under *Gideon v. Wainwright* to impeach a defendant's credibility deprives him of due process of law." 405 U.S. at 483, 92 S.Ct. at 1019.

Also in 1972, the Supreme Court declared that a state rule requiring a criminal defendant to testify first or not at all is unconstitutional. *Brooks v. Tennessee,* 406 U.S. 605, 92 S.Ct. 1891, 32 L.Ed.2d 358 (1972). Suggesting that one can be deprived of his constitutional rights even when he has failed to testify, the Court reversed the conviction. Although the state made no harmless error claim in *Brooks,* the Court implied that forcing a

potentially truthful defendant to choose between taking the stand and risking impeachment or remaining silent violates the accused's due process rights. *Id.* at 612–13, 92 S.Ct. at 1895–96.

More recently, in *New Jersey v. Portash*, the defendant decided not to take the witness stand because of the threatened use for impeachment purposes of immunized testimony given before a grand jury. In holding that such testimony could not be used under any circumstances, the Court stated: "[W]e deal with the constitutional privilege against compulsory self-incrimination in its most pristine form. Balancing, therefore, is not simply unnecessary. It is impermissible." 440 U.S. at 459, 99 S.Ct. at 1297.

These cases suggest that the threatened use of coerced testimony which results in a defendant's decision not to take the witness stand is not subject to harmless error analysis. Yet the State contends that the harmless error standard should apply in this case. It relies primarily on the Supreme Court's decision in *Luce v. United States,* 469 U.S. 38, 105 S.Ct. 460, 83 L.Ed.2d 443 (1984).

The *Luce* Court held that a trial court's erroneous application of Federal Rule of Evidence 609(a) is subject to harmless error analysis. In *Luce,* the petitioner was indicted on charges of conspiracy and possession of cocaine with intent to distribute. He moved for a ruling to preclude the Government from using a 1974 state conviction to impeach him if he testified. The Government claimed that the conviction was relevant because it was for possession of a controlled substance.

Federal Rule of Evidence 609(a) directs a court to weigh the probative value of a prior conviction against its prejudicial effect as impeachment evidence. In applying Rule 609(a), the district court made a conditional ruling: It would exclude the prior conviction if the petitioner limited his testimony to an explanation of his attempt to flee from arresting officers; however, if the petitioner took the stand and denied any prior involvement with drugs, then the Government could use the 1974 conviction

for impeachment. *Id.,* 105 S.Ct. at 462. The defendant did not testify, and he was found guilty.

The Supreme Court determined that a petitioner fails to preserve for review his claim of improper impeachment with a prior conviction if he does not take the witness stand. *Id.* at 464. Unlike the instant case, the petitioner in *Luce* made no commitment that he would testify if his motion in limine was granted. Moreover, he did not proffer to the Court any evidence concerning the nature of his testimony, thus making the district court's balancing under Rule 609(a) a very difficult task. Finally, the Court noted that, if a defendant takes the stand despite an adverse ruling, the Government may nevertheless voluntarily decide to forego using the conviction. Accordingly, "[a]ny possible harm flowing from a district court's *in limine* ruling permitting impeachment by a prior conviction is wholly speculative" where a petitioner has not testified. *Id.* at 463.

■ Because Mr. Biller chose not to take the stand, the State asserts that this Court is precluded from determining the merits of his claim. The State's argument, while facially persuasive, ignores one very important point: The *Luce* decision does not deal with an error of constitutional dimension. The Court clearly distinguished the nature of its inquiries in *Portash* and *Brooks* on the ground that those cases involved "Fifth Amendment challenges to state court rulings that operated to dissuade defendants from testifying." *Id.* at 464. In cases "in which the determinative question turns on legal and not factual considerations, a requirement that the defendant actually testify at trial to preserve the admissibility issue for appeal might not necessarily be appropriate." *Id.* (Brennan and Marshall, JJ., concurring). Accordingly, the *Luce* decision is not applicable to the collateral review of the state court's denial of the petitioner's Fifth Amendment rights. *See United States ex rel. Adkins v. Greer,* 791 F.2d 590, 594 (7th Cir.1986).

The only case the Court has uncovered in which the Supreme Court even suggests the applicability of harmless error analysis

is *Milton v. Wainwright*, 407 U.S. 371, 92 S.Ct. 2174, 33 L.Ed.2d 1 (1972). While more persuasive than *Luce*, *Milton* does not change this Court's determination that the harmless error standard does not apply in the instant case. In *Milton*, the petitioner made statements to an officer who was placed in his cell for two days and posed as a fellow inmate. The petitioner contended that the statements were involuntary under the Fifth Amendment and obtained in violation of his Sixth Amendment rights as interpreted in *Massiah v. United States*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964). Without reaching the merits of these claims and assuming *arguendo* that the challenged testimony should have been excluded, the Court refused to overturn the conviction because the record revealed that any error in the admission of the statements was "harmless beyond a reasonable doubt." 407 U.S. at 372, 92 S.Ct. at 2175.

Other courts have cited the *Milton* decision for the proposition that, in rare circumstances, the admission of a coerced confession can constitute harmless error. *See United States v. Carter*, 804 F.2d 487, 489 (8th Cir.1986); *Harrison v. Owen*, 682 F.2d 138, 140–41 (7th Cir.1982); *United States ex rel. Moore v. Follette*, 425 F.2d 925 (2d Cir.), *cert. denied*, 398 U.S. 966, 90 S.Ct. 2180, 26 L.Ed.2d 550 (1970); *see also United States ex rel. Lewis v. Henderson*, 421 F.Supp. 674, 683 (S.D.N.Y.1976). Nevertheless, the Court finds these cases distinguishable from the instant case.

In *Milton*, the petitioner alleged that one incriminating statement made by him and admitted at trial violated his constitutional rights. However, the jury, in addition to the challenged testimony, properly considered three other full, admissible confessions made by the petitioner prior to his indictment. 407 U.S. at 372–73, 92 S.Ct. at 2175–76. Other courts which have implied exceptions to the absolute prohibition against the use of coerced testimony have involved the admission of multiple confessions, at least one of which was validly entered into evidence. *See Harrison v. Owen*, 682 F.2d at 141 ("[T]he admissible confession is of an extremely high quality and probative value."); *Follette*, 425 F.2d

at 927 (One oral confession was never challenged.) Moreover, the Court questions whether these cases are truly consistent with then existing law. *See Haynes v. Washington*, 373 U.S. 503, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963); *Lynumn*, 372 U.S. at 528, 83 S.Ct. at 917. Nevertheless, even to the extent that they represent a viable analysis of the law involving coerced confessions, other courts have declined to follow their reasoning in cases such as the present, where none of the utilized testimony is constitutionally valid. *See Henderson*, 421 F.Supp. at 684 (Unlike the situation in *Follette*, "all of petitioner's confessions were involuntary.")

Likewise, *United States v. Carter* presents a substantially different situation than does the instant petition. In *Carter*, the petitioner made false alibi statements to an agent. The agent told Carter that he was investigating Carter's involvement in an assault, even though the agent knew that Carter's alleged victim had died. At trial, the agent testified to Carter's false alibi, thus impeaching his credibility when he took the stand. Carter claimed that his alibi statement should have been suppressed as involuntary. However, noting that Carter's legal theory was based on "defective consent: but for the deception he would not have volunteered the false alibi," the court concluded that the introduction of his statements was harmless error. 804 F.2d at 489.

Although it cited *Milton*, the *Carter* opinion clearly indicates that the agent's testimony did not, in fact, constitute the introduction of "coerced" testimony as that term is contemplated by the Fifth Amendment. The court stated: "Only if the word 'coerced' is read to include deception, as opposed to physical or mental compulsion, would the harmless error analysis be inappropriate in the present case." *Id.* at n. 3. This understanding of the nature of "coerced" testimony has recently been approved by the Supreme Court and is consistent with the Court's determination in the instant case. *See Colorado v. Connelly*, —— U.S. at ——, 107 S.Ct. at 520 (Defendant's mental condition, by itself and

apart from its relation to official coercion, should not dispose of the inquiry into constitutional "voluntariness."); *Oregon v. Elstad,* 470 U.S. 298, 305, 105 S.Ct. 1285, 1291, 84 L.Ed.2d 222 (1985) (Fifth Amendment not concerned "with moral or psychological pressures to confess emanating from sources other than official coercion."); *see also Flittie v. Solem,* 751 F.2d 967, 975 (8th Cir.1985) (Official misrepresentations do not make a statement involuntary.)

Finally, the Court feels that, despite the Supreme Court's failure to address the merits of the case, *Milton* is best understood as a Sixth Amendment case. *See* 407 U.S. at 378 et seq., 92 S.Ct. at 2178 et seq. (Stewart, J. dissenting); *United States v. Murphy,* 763 F.2d 202, 208 n. 8 (6th Cir. 1985); *Cahill v. Rushen,* 501 F.Supp. 1219, 1231 n. 17 (E.D.Cal.1980), *aff'd,* 678 F.2d 791 (9th Cir.1982). While the petitioner was under indictment and awaiting trial, the state assigned a police officer to pose as a prisoner and "seek information" from him. 407 U.S. at 375, 92 S.Ct. at 2177. This type of conduct ordinarily implicates an infringement of the petitioner's Sixth Amendment right to assistance of counsel at a critical stage rather than calling into question whether statements he may have been tricked into making were "coerced". *Id.* at 380, 92 S.Ct. at 2179; *see Kuhlmann v. Wilson,* — U.S. —, 106 S.Ct. 2616, 2628–30, 91 L.Ed.2d 364 (1986).

An individual's Sixth Amendment right to counsel attaches "at or after the initiation of adversary judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information or arraignment." *Kirby v. Illinois,* 406 U.S. 682, 689, 92 S.Ct. 1877, 1882, 32 L.Ed.2d 411 (1972). Under the Sixth Amendment, the issue is whether the Government undertook activities which deliberately elicted incriminating statements after the right to counsel attached. *See United States v. Henry,* 447 U.S. 264, 270, 100 S.Ct. 2183, 2186, 65 L.Ed.2d 115 (1980). However, "voluntariness" in the sense of "absence of coercion" is not part of the *Massiah* formula. *Id.* at 273, 100 S.Ct. at 2188; *see Hoffa v. U.S.,* 385 U.S. 293, 303–05, 87 S.Ct. 408, 414–15, 17 L.Ed.2d 374

(1966); *cf. Rhode Island v. Innis,* 446 U.S. 291, 300 n. 4, 100 S.Ct. 1682, 1689 n. 4, 64 L.Ed.2d 297 (1980) ("interrogation" under Fifth and Sixth Amendments not necessarily interchangeable). Significantly, cases involving a violation of the *Massiah* right to assistance of counsel are ordinarily subject to harmless error analysis. *See Henry,* 447 U.S. at 274–75 n. 13, 100 S.Ct. at 2188–89 n. 13; *United States v. Metcalfe,* 698 F.2d 877, 883 (7th Cir.), *cert. denied,* 461 U.S. 910, 103 S.Ct. 1886, 76 L.Ed.2d 814 (1983); *accord Moore v. Illinois,* 434 U.S. 220, 232, 98 S.Ct. 458, 466, 54 L.Ed.2d 424 (1977) (Sixth Amendment right to counsel at pretrial identification.) By contrast, with the exception of *Milton,* the Supreme Court has rejected the assertion that the use of coerced statements is ever subject to harmless error analysis. *See Mincey,* 437 U.S. at 398, 98 S.Ct. at 2416; *Haynes,* 373 U.S. at 503, 83 S.Ct. at 1336; *Lynumn,* 372 U.S. at 537, 83 S.Ct. at 922; *Payne,* 356 U.S. at 568, 78 S.Ct. at 850.

### C. Harmless Error

■ There is a "strong presumption" that errors which occur during a criminal trial are subject to harmless error analysis. *Rose v. Clark,* 106 S.Ct. at 3106–07. However, in order to conclude that a defendant was not prejudiced by a federal constitutional error, the Court must be able to declare a belief that the violation was "harmless beyond a reasonable doubt." *Chapman,* 368 U.S. at 24, 87 S.Ct. at 828. Even assuming the applicability of the harmless error standard to the derivative use of Mr. Biller's coerced grand jury testimony, the Court cannot find that error harmless beyond a reasonable doubt.

"The heavy burden imposed by *Chapman* derives from the principle that, since a holding that an error of constitutional dimensions was nonprejudicial is a factual determination, a reviewing court should not lightly find a constitutional error to have been nonprejudicial, particularly where ... the defendant's constitutional right of trial by jury would be implicated by such appellate fact-finding." *Klein v. Harris,* 667 F.2d at 290. A reviewing court should not

blindly speculate: Only where it can find that the record developed at trial establishes guilt beyond a reasonable doubt should the judgment be affirmed. *Rose v. Clark,* 106 S.Ct. at 3107. Since a reviewing court must be able to declare that an error was harmless beyond a reasonable doubt after examination of the entire record, it is difficult to presume harmless error from a silent record. *See Delaware v. VanArsdall,* 106 S.Ct. at 1436; *Klein v. Harris,* 667 F.2d at 289–290.

■ Once a petitioner establishes the infringement of a constitutional right, the burden shifts to the State to establish that the error was harmless. *Hawkins v. Le-Fevre,* 758 F.2d 866, 877 n. 15 (2d Cir.1985); *Scarborough v. State of Arizona,* 531 F.2d 959, 962 (9th Cir.1976). The State purports to meet its burden by relying on the fact that the petitioner never took the stand. The Court is unwilling to find that the respondent has met its burden by citing what is, in effect, a silent record. *Cf. Potts v. Estelle,* 529 F.2d 450, 455 (5th Cir.1976) (Given silent record, burden is on State to show waiver of right to counsel.)

■ Where material facts are not adequately developed at a state court hearing, a district court can properly re-examine the state court's finding. *See White v. Estelle,* 685 F.2d 927, 929 (5th Cir.1982); *Suggs v. LaVallee,* 570 F.2d 1092, 1114–15 (2d Cir.), *cert. denied,* 439 U.S. 915, 99 S.Ct. 290, 58 L.Ed.2d 263 (1978). The record is silent concerning the petitioner's proposed testimony at the *Biller II* trial; therefore, it is difficult to determine the prejudicial effect of his failure to present his testimony. Since a review of the record will not assist in the resolution of this issue, the Court asked the petitioner to submit additional evidence which sets forth the nature of his proposed testimony. *See Turner v. Chavez,* 586 F.2d 111 (9th Cir.1978). Because of a serious heart condition, the petitioner was unable to testify at a hearing. Instead, the petitioner has filed an affidavit which briefly outlines the nature of his proposed testimony.

The State has strenuously objected to the admission of this affidavit on two grounds: (1) It is a self-serving document which cannot be cross-examined; and, (2) The petitioner has waived his opportunity to present his proposed testimony because he never proffered the content of the testimony to the trial court. However, 28 U.S.C. Sec. 2254, Rule 7(a) allows a federal court to order expansion of the record where appropriate. Such expansion, which is "without limitation," permits the admission of an affidavit in an appropriate case. 28 U.S.C.Sec. 2254, Rule 7(b); *see Miller v. United States,* 564 F.2d 103, 106 (1st Cir. 1977), *cert. denied,* 435 U.S. 931, 98 S.Ct. 1504, 55 L.Ed.2d 528 (1978). Moreover, admission of this affidavit does not disturb the presumption of correctness afforded state court factual findings since it only clarifies an important factual matter not addressed on the record by any state court. *Cf. Hearn v. James,* 677 F.2d 841, 844 (11th Cir.1982); 28 U.S.C.Sec. 2254(d)(1) and (3).

In addition, the respondent has presented no support for his assertion that the petitioner has "waived" his right to ever present this evidence because he failed to proffer his proposed testimony. The petitioner may or may not have made a proffer *in camera,* but the record is silent in this regard. The Court agrees that providing a trial court with such information is valuable and necessary in many instances. *See State v. Binet,* 192 Conn. 618, 624, 473 A.2d 1200 (1984); *cf. Luce,* 105 S.Ct. at 464. Presumably, if the trial judge needed this information, he would have asked for it, even if it were not proffered. Moreover, this record suggests that the trial judge would have considered the *Biller I* conviction properly admissible for impeachment because it was so relevant on the issue of credibility, regardless of any proffer which the defense may have made. *See Biller I* Transcript at 11–12 (Judge notes conviction was for "faulty" certification of an oath); Conn.Gen.Stat.Sec. 52–145(b) (Conviction of crime is admissible for purpose of affecting credibility); *see also State v. Geyer,* 194 Conn. 1, 10–11, 480 A.2d 489 (1984). Because this petition involves an error of constitutional magnitude rather than a mere

evidentiary ruling, the Court feels that admission of this affidavit is consistent with a fair and complete consideration of the petitioner's claim. *Cf. Kuhlmann v. Wilson,* 106 S.Ct. at 2627 (Successive petition may be entertained when prisoner makes colorable showing of factual innocence.)

In *Biller II,* the petitioner was convicted of interfering with a police officer. "A person is guilty of interfering with an officer when he obstructs, resists, hinders or endangers any peace officer or fireman in the performance of his duties." Conn.Gen. Stat.Sec. 53a–167a(a). Section 53a–167a requires a defendant to "have acted with the intent to interfere with the performance of the officer's duties." *State v. Beckenbach,* 1 Conn.App. 669, 679, 476 A.2d 591 (1984), *rev'd on other grounds,* 198 Conn. 43, 501 A.2d 752 (1985). In application, this statute "exclude[s] any accidental or inadvertent interference." *State v. Anonymous,* 34 Conn.Sup. 531, 543, 375 A.2d 417 (1977); *State v. Walker,* 34 Conn.Sup. 548, 550, 375 A.2d 426 (1976).

The evidence which supports Mr. Biller's conviction indicates that, after he was handcuffed, officers attempted to search his pockets. The petitioner apparently resisted their efforts to obtain the contents of his pockets until he was seated in the police car. *Biller II,* 5 Conn.App. at 618–19, 501 A.2d 1218. Through his affidavit, the petitioner claims to have complied with the request of the arresting officer that he stick out his hands so that he could be handcuffed. This compliance is explicitly supported by the record. *Biller II* Transcript at 399 (testimony of Officer Howard). The petitioner admits that, subsequent to his being handcuffed, he was doubled over, thus hindering officers from immediately seizing the contents of his pockets. Nevertheless, he asserts that his testimony would have shown that he did not *intend* to obstruct the arresting officer from entering his pockets. He states that the handcuffs were applied too tightly, thus causing him significant pain. By bending over, he only hoped to bring his hands to his knees so that he could "move the handcuffs to a thinner portion of [his] wrists...." In addition, he states that his bending over was a reaction to the humiliation he felt due to being arrested in the front of a crowd at the scene of the fire. This evidence, if presented and believed by the jury, would necessarily negate the intent required to commit the crime of which Mr. Biller was ultimately convicted.

Even if the Court were to ignore the petitioner's affidavit, it would still be unable to conclude that the erroneous threatened use of the *Biller I* conviction was harmless error. Assessing the strength of the prosecution's evidence against the defendant is part of applying the harmless error standard. *Holloway v. Arkansas,* 435 U.S. at 488, 98 S.Ct. at 1180. Most of the evidence supporting the petitioner's conviction was supplied by the two arresting officers. *Biller II* Transcript at 327–328 (testimony of Officer Toscano) and 399–400 (testimony of Officer Howard). Virtually no other testimony was presented which either supported or refuted the officer's charges that the petitioner intentionally hindered their attempts to retrieve torn papers from his pocket. *See, e.g., Biller II* Transcript at 178–84 (Wilken Shaw "not sure" about details of Biller's arrest because he "wasn't noticing that close."); 253 (Willa Shaw summarily states Biller resisted officers' attempts to get papers); 271 (Allan Sabel indicates Biller was cooperative at all times during the arrest.) In fact, the entire trial was largely focused on the charge of acting as a public adjuster without a license; the interference charge was seemingly treated as collateral by both parties. The jury, if given the opportunity to hear from the petitioner and to observe his demeanor on the witness stand, could have rationally rejected the relatively unsupported testimony of the arresting officers. This possibility makes it impossible for the Court to conclude that the petitioner's failure to testify had no prejudicial impact on the outcome of the trial. *See Hawkins v. LeFevre,* 758 F.2d at 878 (harmless error standard sensitive to impact of violation on judicial process).

### Conclusion

As the record clearly demonstrates, the State made derivative use of a conviction

obtained in violation of the Fifth Amendment. This use resulted in the petitioner's decision not to testify on his own behalf. Whether the automatic reversal or the harmless error standard is applied, the petition for a writ of habeas corpus must be GRANTED. The petitioner is to be released unless the State promptly affords him a new trial.

SO ORDERED.